**GILL et al. v. MUTUAL LIFE INS. CO. OF NEW YORK.**

No. 9467.

Circuit Court of Appeals, Eighth Circuit.

Feb. 23, 1933.

Arthur F. Mullen, of Omaha, Neb. (Clarence A. Davis, of Holdredge, Neb., and Paul P. Massey, of Omaha, Neb., on the brief), for appellants.

David A. Fitch, of Omaha, Neb. (Frederick L. Allen, of New York City, Norris Brown and Ralph M. West, both of Omaha, Neb., on the brief), for appellee.

Before STONE, VAN VALKENBURGH, and BOOTH, Circuit Judges.

VAN VALKENBURGH, Circuit Judge. June 21, 1930, appellant Robert L. Gill made application to appellee for two life insurance policies in the principal sums of $10,000 and $15,000 respectively. The written application contained, among other things, the following provisions:

"All the following statements and answers, and all those that the insured makes to the company's medical examiner, in continuation of this application, are true, and. are offered to the company as an inducement to issue the proposed policy. The insured expressly waives on behalf of himself or herself and of any person who shall have or claim any interest in any policy issued hereunder, all provisions of law forbidding any physician or other person who has attended or examined, or who may hereafter attend or examine the insured, from disclosing any knowledge or information which he thereby acquired. The proposed policy shall not take effect unless and until delivered to and received by the insured, the beneficiary, or by the person who herein agrees to pay the premiums, during the insured's continuance in good health and unless and until the first premium shall have been paid during the insured's continuance in good health."

"It is agreed that no agent or other person except the President, Vice-President, a Second Vice-President, or a Secretary of the company has power on behalf of the company to bind the company by making any promise respecting benefits under any policy issued hereunder or accepting any representations or information not contained in this application, or to make, modify, or discharge any contract of insurance, or to extend the time for payment of a premium, or to waive any lapse or forfeiture or any of the company's rights or requirements."

The insurance company, on June 27, 1930, caused two policies of insurance for the amounts applied for respectively to be executed by its president and secretary, and these policies were delivered to appellant Robert L. Gill August 15, 1930, by one Hofgard, a district manager of appellee in four Nebraska counties, who obtained the application for these policies from Gill. His duties consisted in appointing new agents, supervising agents, writing insurance, collecting premiums, and delivering policies.

February 6, 1931, appellee filed suit in the district court for the district of Nebraska to cancel said policies of insurance upon two grounds: (a) That the answers of the insured made to the company's medical examiner, and offered as an inducement to the company to issue the proposed policies, were false, and deceived the company to its injury, and (b) that at the time said policies were delivered to him the insured was not in that state of health, which was a condition precedent to the taking effect of the policies. The court resolved the first of these contentions in favor of appellants, but sustained the second ground of the complaint and decreed cancellation accordingly.

The main contention of the appellants is that the knowledge of Hofgard of Gill's condition of health when he delivered the policies was the knowledge of the insurance company, which thereby waived the contract provision that the policies should not take effect unless delivered to and received by the insured during his continuance in good health. Appellee renews its insistence that the finding of the trial court that appellant Robert L. Gill made untrue answers to appellee's medical examiner in the application requires a cancellation of the policies, apart from the conditions existing when the policies were delivered. However, in the view we take concerning the latter asserted ground for cancellation, and the conclusion of the chancellor thereon, we deem it unnecessary to consider the question of whether the misrepresentations made were calculated to deceive the insurance company to its injury. We pass, therefore, to a consideration of the physical condition of the insured at the time the policies were delivered, and since, and the question of waiver raised by appellants.

May 31, 1930, Gill was attended by Dr. Rasmussen and was given a prescription for "minor gastro-intestinal disturbance." June 11, 1930, he was again attended by Dr. Rasmussen who made a physical examination, taking blood pressure, weight, etc. June 17, 1930, he saw Dr. Rasmussen again, and, on June 21, 1930, he made application for the two policies and was examined by the company's physician, in the course of which examination he stated that he had consulted no physician or practitioner for any ailment, serious or not serious, within the (then) past five years. June 27, 1930, less than a week later, he again consulted Dr. Rasmussen, who prescribed digitalis, a heart stimulant. July

12, 1930, Gill was examined by Dr. Ridell— a partner of Dr. Rasmussen—who found said appellant suffering from angina pectoris, a considerable enlargement across the base of the heart, and fatty degeneration of that organ. Incidentally this diagnosis corresponds with that made by Dr. Ridell at the time he made an examination of Gill November 9, 1928. Mr. Gill states that Dr. Ridell told him his trouble was termed angina pectoris, and that it was rather unusual for a person of his age to have it. Shortly after this examination of July 12, 1930, Gill went to Virginia with his wife and children, returning August 14, 1930; while there he testifies that he received a letter from Hofgard, the substance of which he states from memory as follows: "He mentioned that from information he had gotten from Dr. Ridell that it was highly improbable that I would be able to stand another physical examination, and that if the premiums on these policies were paid within sixty days that no further physical examination would be required, and for that reason, if I didn't expect to be back within that time to be sure to write him, and if it was not convenient to pay the amount of the premium I could pay as much as two hundred dollars and the balance he could arrange to be paid later. I think that was the substance of the letter."

This version of the contents of the letter is corroborated by the wife and son of the insured. Mrs. Gill testifies that Hofgard called at her house for the letter; she gave it to him and "he walked off with it." The letter was not produced. Hofgard denies that he stated in the letter that he had talked with Dr. Ridell and that it was questionable whether Gill could pass another examination. Such, however, is the insistence of appellants, upon which they count for such knowledge in appellee of the physical condition of the insured as would constitute a waiver of the strict terms of the insurance contract. On the day following the return of the Gills, Hofgard appeared and an arrangement was made whereby Gill paid $262.50 of the premium in cash, and gave his note for the balance of $800. Hofgard's commission was 55 per cent. of the first year's premium, and 42½ per cent. of the next six renewal premiums.

Beyond successful dispute the insured was not in good health as required by the insurance contract when the policies were delivered. The evidence establishes conclusively that he was suffering from angina pectoris, a serious affection of the heart. Concerning it Dr. Ridell testified:

"Q. What is angina pectoris? A. A pathological condition of the heart characterized by sharp pain over the heart region which radiates to the left shoulder and left arm, and pathologically it is a disease of the blood vessels supplying the heart muscle itself. * * *

"Q. How would you characterize the condition that you found Mr. Gill to be in with reference to being serious or otherwise? A. Anyone who has angina pectoris is always in a serious condition.

"Q. And what can you prognosticate with reference to the effect or result of angina pectoris? A. A patient suffering from angina pectoris may live a long time or the end might be very sudden and fatal in a few moments.

"Q. Can you give a guess as to how many days, weeks, months, or years a person will or will not live? A. No, sir.

"Q. What effect does angina pectoris and this condition have on a person's ability to exert themselves in such a way as walking upstairs? A. Usually the subjective symptoms of angina pectoris appear very rapidly upon any exertion, mental or physical. He did not observe Mr. Gill after he had walked upstairs.

"Q. What did he tell you at the time of this examination? A. His complaint was pain over the heart upon exertion, which radiates to the left shoulder and arm and that it was worse at night.

"Q. Did he say anything about having difficulty in walking upstairs? A. He mentioned that some time previous he had noticed that the exertion of climbing the stairs where his own office was located bothered him, and that he occasionally had to stop to rest. * * *

"Q. And this condition which he has, is that what you would call a permanent condition? A. Yes, sir."

Dr. Hollister, who examined Gill for this insurance, testified as follows on this subject:

"The symptoms of angina pectoris are subjective and variable—a sharp pain in the chest, especially on the left side and darting down the left arm. These are subjective symptoms—would have no trouble telling if he had angina pectoris if he were present when he had the attack. Angina pectoris is an extremely serious disease. If Gill has angina pectoris, he is not in good health and would never be in good health again.

"Q. I was going to ask if a man had

angina pectoris and was examined by the doctor but refrained from telling the doctor that he had at any time any pains in his heart and radiating from his left shoulder and arm, is it possible you might examine him when he was in a period of relaxation and not discover it unless he tells you about those things? A. It is."

 It is significant that the insured had repeatedly consulted a physician within a short period prior to his application for this insurance; that again, in less than a week, he was attended by Dr. Rasmussen, who prescribed digitalis, a heart stimulant. In about two weeks thereafter he consulted Dr. Ridell, a partner of Dr. Rasmussen, who found, "by carefully observing Mr. Gill, and listening to his subjective symptoms and adding on to that my objective findings," that he was suffering from angina pectoris. It sufficiently appears from Gill's testimony that Dr. Ridell told him he had angina pectoris. Shortly thereafter he went with his family to Virginia for a vacation. While there he received from Hofgard, the soliciting insurance agent, the letter to which reference has been made. It is beyond question that he knew his condition, and that he knowingly received these policies when not in good health, contrary to the provisions of his insurance contract. It is well settled that this clause in that contract, which provides that a policy shall not become effective unless delivered and received while the insured is in good health, is valid and will be enforced; and that the knowledge or acts of the insurer's local agent, or of any person other than those named in the contract as empowered to modify it, shall not be binding upon the insurance company nor constitute a waiver of contract provisions. This is the established rule in the national courts and is supported by the weight of authority in state jurisdictions. Sun Insurance Office v. Scott, 284 U. S. 177, 182, 52 S. Ct. 72, 76 L. Ed. 229; Jensen v. New York Life Ins. Co. (C. C. A. 8) 59 F.(2d) 957; New York Life Ins. Co. v. McCreary (C. C. A. 8) 60 F.(2d) 355, 358, 359; Inter-Southern Life Ins. Co. v. McElroy (C. C. A. 8) 38 F.(2d) 557; Ætna Life Ins. Co. v. Roewe (C. C. A. 7) 38 F.(2d) 393; Ætna Life Ins. Co. v. Johnson (C. C. A. 8) 13 F.(2d) 824; MacKelvie v. Mutual Ben. Life Ins. Co. (C. C. A. 2) 287 F. 660; Union State Bank & Trust Co. v. Northwestern Life Ins. Co. (C. C. A. 5) 55 F.(2d) 1070; Curtis v. Prudential Ins. Co. (C. C. A. 4) 55 F.(2d) 97.

 "The general rule which imputes an agent's knowledge to the principal * * * does not apply when the third party knows there is no foundation for the ordinary presumption,—when he is acquainted with circumstances plainly indicating that the agent will not advise his principal." Mutual Life Ins. Co. v. Hilton-Green, etc., 241 U. S. 613, 36 S. Ct. 676, 680, 60 L. Ed. 1202.

The rule thus announced has special application to the instant case. If, as appellants claim, Hofgard, with express knowledge of Gill's noninsurable physical condition, urged a speedy payment of premium and final performance of the insurance contract, in order to avoid the necessity of further medical examination, it was and is obvious, whatever his motive, that he would not advise his principal, and thus defeat the very consummation which he desired. In this aspect of the case he occupied a position of disloyalty and antagonism to his company, and his knowledge could not be imputed to it. If, on the other hand, the claim of Hofgard, that he had no information from Dr. Ridell, did not mention his name to appellant Gill and did not say in his letter that it was questionable whether the insured could pass another examination, is to be indulged, then appellants have failed to prove an essential element in the claim of waiver. Appellants contend that the knowledge of Hofgard binds appellee by virtue of a Nebraska Statute, C. S. Neb. § 44-307, which provides:

 "'Agent, Defined. Any person, firm or corporation in this state who shall with authority receive or receipt for any money on account of, or for any contract of insurance made by him or them, or for any such insurance company or individual aforesaid, or who shall with authority receive or receipt for money from other persons to be transmitted to any such company or individual aforesaid for a policy or policies of insurance, or any renewal thereof, although such policy or policies of insurance may not be signed by him or them, as agent or agents of such company, or who shall in any wise make or cause to be made any contract or contracts of insurance, for or on account of such company aforesaid, shall be deemed, to all intents and purposes an 'agent' or 'agents' of such company."

As ruled by this court in New York Life Ins. Co. v. McCreary, 60 F.(2d) 355, 359, this and like statutes "make the soliciting agent the agent of the insurer, but they leave the extent and nature of his authority as such agent of the insurer to be determined by the general law of agency." Citing many cases.

In Ætna Life Ins. Co. v. Moore, 231 U.

S. 543, 559, 34 S. Ct. 186, 58 L. Ed. 356, it was held that it is competent for applicants for insurance to make agreements that the company, or one or more of its executive officers, and no other person, can make any waiver of the terms of the insurance contract; that this is a matter of general jurisprudence, and, therefore, that state decisions to the contrary are not controlling.

The decision of the chancellor on this point, which led to the decree of cancellation, is supported not only by substantial evidence, but by the overwhelming weight of the evidence, and that decree should be and is affirmed.